Good morning. My name is Robert Hess and I represent the appellants in the Rios case. This case involves a claim by Ms. Rios for disability benefits under two ERISA governed policies. Although the claim was initially approved, it was denied shortly thereafter, based on the determination that Ms. Rios was not disabled from performing the duties of her own occupation. And the timing of the claim denial here is pivotal. That claim was denied less than three months into the policy's own occupation period of disability, and well before the transition into the any gainful occupation definition of disability, which would not have occurred until 24 months of benefits had been paid. The district court committed clear error when it took it upon itself to make a determination in the first instance of any occupation period. Is that a fact? Clear error is not the standard, is it? I'm sorry? I mean, clear error is not the standard. That's not the standard for reviewing facts. This is a fact. It's an abuse of discretion standard probably, or maybe a legal question, but it's not a clear error standard. Then I'll offer that. The district court abused its discretion in taking it upon itself to evaluate and adjudicate a claim in the first instance under a new standard of disability that had not been determined by the claim administrator. And the district court's decision to do that and the refusal to remand that claim to the claim administrator is a direct conflict to ERISA's comprehensive statutory scheme. And that scheme provides the rights and obligations of claim fiduciaries, participants, and it provides that claim administrators, not the courts, are the appropriate entity to evaluate disability claims in a first instance. Is that really the problem here, or is the problem that the record in the case doesn't cover the relevant time period? If it did cover the relevant time period, in other words, if there were material in the record from the relevant time in 2020, then presumably the district judge, because it was de novo anyway, could have decided it. But there actually isn't, is there? You're correct. The record is incomplete for making any occupation determination. Because again, the record closed in this case in April 2019 when the final determination was made, and the any occupation transition date was 15 months later in July 2020. When was the trial held before Judge Carter? What month? The trial before Judge Carter was in, gosh, I think it was late 2020. I want to say November. So by that time, the any occupation date had kicked in, and I guess part of what I understand the plaintiff to be saying is that, you know, we had the any occupation claim on the table all the way along, and you could have put in evidence about that if you wanted to. Fair enough, but remember, Your Honor, that an ERISA case is based upon a record, and the record closed when the final determination was made, and that was in April 2019. That was in 2019. Exactly. And you didn't have any medical records then from April 2019 through whatever the trial date was, basically. That is exactly correct. But I thought when it was denounced, we all agree that this was such a novel determination, so there could have been additional records submitted, couldn't there have been? In the court. The court has discretion to consider extrinsic evidence, and in fact it did so here in the form of the Social Security Administration, of course, but the review that the court is supposed to do is a review of the decision that was made based on the record that was in front of the claim administrator at the time that record was made. So it is a closed record, and so to open up a lot of- Well, to open up every case to allow claimants to submit additional records would defeat the purposes of ERISA, which are to provide quick and expedient evaluations. So- Did you get to do discovery before the district court in this case, or was it not? There was no discovery, and typically in ERISA cases, there is not. So it's, again, a review of the decision made at the time the record was closed. And again, not only was the record closed in April 19, 2019, but the medical records were last updated in February 2019. So to evaluate any occupation claim that would not have become relevant or adjudicated until July 2020, the administrator would have had to do so, and the court took it upon itself to do so in this case, based on a record that was incomplete. And that flies in the face of ERISA Section 503, which requires claim administrators to perform reviews, to make decisions based on a full and complete record. This record was clearly incomplete. Well, basically what I understood the district judge to say was that it was futile because what the record did demonstrate was that she had, and I understand you congest this, but you're not congesting it at the moment, a disability which made her unable to perform even sedentary work. And the record also showed that this was a permanent and progressive disability, so there was essentially no chance it was a gauge of it. That's what I'm interested to see. What's wrong with that? Monty, Your Honor, and I do take issue with the determination that she was disabled. That's not what you're doing. You can switch over. I'll set that aside for a moment. The problem is it requires the court, without medical resources, to make a medical prognostication about what Ms. Rios' status will be 19, 15 months into the future, based on incomplete medical records. The doctor said she's never going to be able to work. There was one doctor. There are many reasons which I will get to why that doctor's opinion was less than credible, but there's only one doctor, Dr. Steiner, who Ms. Rios turned to after her claim was denied, who declared her to be permanently and totally disabled from all work activities. And, again, there are numerous reasons why his opinions are less than credible. Even if you accept his opinion, presumably one of the things she could have done, if Ms. Rios could have done this, she could have said, okay, this is bad enough, I'm now going to go ahead and get the steroid injections, or I'm now going to go ahead and have the surgery, and maybe your condition could have improved, right? Exactly. And spinal conditions, including herniated discs, can resolve on their own over time, or at least improve over time. But the point being that neither the courts nor claim administrators should be put in the position of having to speculate about what a person's condition will be sometime in the future, when the bottom line is this in-the-out in-patient claim never came right, never right into this stage where it needed to be evaluated. Now, can you tell me where in the record the Social Security Administration determination is? It's at pages, I believe, 159 to 162. Volume 1, volume 2, volume 2? I believe it's volume 2, Your Honor. Okay. Go ahead. I mean, one possible response to what you're saying is that that was a permanency determination, as I understand it, or an occupation determination. Interpretation? Yes. Okay. There are problems with the ALJ's decision. And keep in mind that the ALJ is not required to concord with the statutory schemework set forth in ARESA. So the ALJ is deciding sedentary capacity and work capacity. But what is clear from the ALJ's decision is that the claimant, Ms. Rios, misrepresented the capacity or work capacity, I'm sorry, or work requirements, because the ALJ's opinion is based on the assumption that her job required her to perform at a light exertional level, whereas the record in this case, including admissions by a plaintiff, showed that her job was sedentary. So that's the first problem. The ALJ also misread the evidence. For example, the ALJ cited the opinion from Dr. Hahn and said Dr. Hahn testified that Ms. Rios had a two-hour sitting limitation. If you look at Dr. Hahn's note that the ALJ was referring to, he uses unusual language. He says that my patient alleges that she can't sit. So that was not a disability determination by Dr. Hahn. It was him simply recording Ms. Rios' subjective complaints. And then finally, the ALJ's determination was determined in part based on the Social Security rule that requires the ALJ to take into account Ms. Rios' age. She was 58 years at the time, and the court is required to consider her a person of advanced age, and the court even qualifies its determination that it would have found her disabled from a sedentary occupation based on her age. So there are numerous reasons. But again, the fact that the ALJ award was issued contemporaneous with the transition date turns on its head the court's decision to declare this a futile claim. And I want to go back to the Diaz case issued by this court. Diaz v. United Act, that's where the court discussed the futility doctrine, and it said in order to apply the futility doctrine, the court has to determine that a claim was demonstrably doomed to fail. And the court did not follow that doctrine. In this case, the court took a look at Ms. Rios' claim and said, I think she would be entitled to any occupation benefits, and that's the basis for the application of the futility doctrine. But if you think about it in terms of what additional evidence would have been placed into the record that would have been developed over the 15 months between the time the record closed and the date of the occupation transition period, it doesn't make sense. There's no basis to argue that it would have been futile for her to make an any occupation claim. And that's the standard that wasn't followed. But she did make an any occupation claim, didn't she? She did not. Her claim was for own occupation benefits. I thought that she just – well, the complaint in this case does make that claim, doesn't it? The complaint does, Your Honor. But she didn't do it anywhere in the administrative proceedings, did it? She said she thought she was entitled to any occupation benefits in her appeal letter. Right. That's what I just said. Okay. Are you comfortable with what I just said, Your Honor? No, she said she thought she was, so she did make the claim. That's not the problem. The problem is that the date hadn't come up yet, and there was, therefore, no medical evidence about it. But she did make the claim. She didn't go through the normal process. Her attorney said he thought she was entitled to any occupation benefits when he submitted his appeal. The claim administrator, at that point in time, was still well within the own occupation period. The claim administrator did not evaluate and certainly did not adjudicate any occupation claim. There is no reason to think there are – I mean, there may – don't you think there could be certain circumstances in which somebody's condition – I mean, somebody had a heart blast or a car accident or worse or something terrible. It would seem sensible to conclude and make the claim at the beginning that, you know, I'm just never getting better and I should get both own occupation and any occupation. Fair enough, Your Honor. But in that circumstance, the own occupation claim most likely would have been approved, and so it would have naturally progressed into the any occupation period. Yes, but I'm sorry. You still would have had us have a second proceeding. There would not be a second proceeding if the own occupation benefits are being paid continuously and the claim reaches the 24-month period. The administrator will, on its own, conduct the any occupation evaluation. So that's another proceeding. So it never happened in this case. I understand that better. Okay. But they wouldn't say at the outset they bothered to do that? They wouldn't say at the outset, yes, you're right. Well, certainly, they would have the discretion to do so based on the nature of the claim. But low back pain, based on degenerative disc disease, does not promote that type of early evaluation of an any occupation claim. And I'd like to remind the Court what its decision in Saffold v. Sierra Pacific in 1996, where the Court evaluated this same issue and held that where a claim administrator is faced, I'm sorry, where the claim enters a new phase of disability and the claim administrator has not yet evaluated that benefit, the claim under a new definition of disability, courts are to remand the claim to the administrator to develop the record and to make a decision in the first instance. Was that Bruce's discretion case? That was pre-Avada? It was, it was, Your Honor. But it was the exact issue that's happened here, whether it's Bruce's discretion or De Novo. And remember, De Novo still requires a decision. And so the underlying court, I'm sorry, the district court, didn't have a decision that it was going to review. You can't review a decision that was not made. But they made the claim and they didn't give it to Congress, so it seems like they made a negative decision on it, right? That is reading too much. If you take a look at the appeal letter and the appeal response, it's all about the own occupation claim. They did not evaluate the any occupation claim. They couldn't have because in order to do so, they would have had to have medical records. Through the date of the any occupation period, they would have had to perform a vocational analysis about what other jobs potentially were available in July 2020. They didn't do that because they couldn't do that because that was 15 months into the future. So there was no decision for this court, for the underlying court, to review on the any occupation claim. Is that correct? Thank you very much. Thank you. Mr. Bowman. Good morning. Anthony Bowman for Yolanda Reeves. Plain and happily. Well, the first thing I'd like to say is that under Armani, the decision of Armani, Yolanda Reeves was unable to perform sedentary work. She was unable to sit more than four hours. And by the definition of sedentary work in Armani, she was therefore unable to perform her own occupation. She was unable to perform her regular occupation in the national economy, and she was unable to perform any sedentary work. And the decision in Armani was an any occupational disability decision. And it's clear that Ms. Rios was unable to perform any sedentary work. Why is it clear that that was going to be true a year and a half later? Say it again, Your Honor. It's clear that that would be true a year and a half later. Well, that's what Dr. Simpson, Your Honor. Yes, but there are two things about that. One is that as Judge Canelli indicated, it appears that she was not getting steroid shots or surgery, and there doesn't seem to be a suggestion that that doesn't matter substantively. But it certainly is quite possible that after living with this for a while, she would just change her mind about the risk factor. So we don't know actually whether she ever ameliorated this condition, and the jury doesn't know that. And secondly, in just the projective determinations by doctors, you have some facility, but they're not the same. The title seems to be the same. So there's some difference as to evaluations of what's true at the time because they're notoriously inaccurate. People say that, you know, you're going to die of cancer in six months, and people live ten years. It's very difficult to rely on those things. So I'd say at least in my experience that it is particularly not true for her. So did Judge Carter do enough with regard to the analysis of the record in that regard? Did he do enough with I.E. that it was sufficiently predictably accurate that he should make a finding of fact that she was never going to get better? Did he make a finding of fact that she was never going to get better? By the way, were those findings of fact written by the plaintiff? Were Judge Carter's findings of fact written by the plaintiff? Are his findings of what? Written by the plaintiff. Were they written by the plaintiff? Who drafted them? The judge? The court did. Did the court write those? You didn't draft them? It looked like a party draft. I mean, I don't think it's been done anymore, but it did look like that. Okay, go ahead. No, the plaintiff had no other party drafting judgment. That was the court's judgment. But to get to your earlier point, Your Honor, doctors don't have a personal goal any more than the rest of us. Okay. Based on their experience, skill, and training, they can make medical judgments. This is a prognosis in their patient's case that to a medical certainty. It's not an absolute certainty. We all agree on that. But that's the best that we can do, medical certainty. Okay. And the doctors that examined her, there were eight health care providers. I'll just walk on. Mr. Hicks seems to imply that there were eight treating providers. There were two orthopedists who saw her. There was one pain specialist who saw her. There were two primary care doctors who saw her. And there was a gynecologist who performed a hysterectomy in the hopes of getting her back pain cured. At that time, she had both back pain and pelvic pain, and she agreed to the surgery and the hysterectomy that was performed by Dr. Aguilera. Her back pain didn't get better. Her pelvic pain did, and that's good. But she was unable to return to work because she continued to have back pain. And it is true that the doctors that she saw suggested to her more invasive treatment options. At the time, she was being treated with opioid medication, Dramadol, muscle relaxer, Flexeril, or cyclodenzaprine. It's a generic name. And she also was advised by several of the doctors to consider epidural nerve block injections in her back and to consider surgery on her back. Okay. Now, Dr. Malhaes, one of the orthopedic surgeons that was seeing her, kept telling her she needs to have back surgery. But back surgery, and I think your honors have seen this in the cases before you, back surgery does not always go well. And it's a tricky business. Sometimes patients are better. Our problem right now is that we know that she made those determinations 15 or 18 months before the transition date, but we don't even really know now, at least as far as I know in the record, that as of the transition date, she hadn't had that surgery or taken the gesturations. And she may never have, you know, may never have had that surgery. I understand that, but how do we know that she's not walking around perfectly fine right now, from this record? How does this record know? Well, if there is evidence, let us say she gets benefits, and her benefits are reinstated. And let us say she's walking around fine. Okay? Then we can challenge the benefits. How do we know that as of the transition date she wasn't walking around just fine? Why didn't this record demonstrate that? Well, we don't have contemporary records as to the transition date. What we do have, Your Honor, is we have the medical opinions of board-certified doctors. Fifteen months before that she wasn't going to be walking around just fine, but the date's coming on, and we don't know. I mean, she could be walking around just fine. Well, would Your Honor have a problem if we let us change the diagnosis just a little bit? Let's say she had ALS, the Guernsey Disease. Well, thankfully she doesn't. I just feel the same hypothetical, but this isn't that. Well, her doctors say she's never going to get that. They say that, but there's something disconcerting about the fact that we could certainly somebody ought to want to find out as of the transition date whether she actually was fine or not. So, look, the difference between this and ALS and the difference between this and being a quadriplegic is that in this situation there's some medical treatment that could be done that potentially could ameliorate this. Maybe it wouldn't work, maybe it would work. And I think the point is that as of the transition date there's nothing in the record that was before Judge Carter that says what her status was then. She could have changed her mind in those 15 months and decided, geez, I'm going to have this surgery after all and maybe it went fine, or heck, I'm going to have the steroid injections and maybe they resolve my pain enough so I can sit now for enough amount of time. The point is that the record doesn't have anything about what her status was as of the transition date. And unlike ALS, which is something that there's no therapy you can do for it, and unlike being a quadriplegic ditto, this is different. So how do you respond to that? I understand your point completely. And the response is that the medical evidence, which Judge Carter accepted, has shown futility, allowed him to move on and unexhausted any occupational pain. That happens all the time. Judges, there's nothing magical about the transition date. If the medical evidence shows that beyond a medical certainty, to a medical certainty, if the evidence shows that... to demonstrate whether or not she was still disabled and had, I don't know, any occupation basis, but he didn't. There's something very disconcerting about the fact that the evidence certainly exists that at the time of the trial, this is what her status was, and instead he's relying on predictions from 15 months before. Yes, but those predictions, he believed, showed that exhaustion would be any occupational pain. I'm not even talking exhaustion at this point. I'm talking about an alternative. Either it could have been sent to the agency, to the insurance company, remanded, or perhaps it could have been tried because it was Genovo. In court, one way or another, you'd think you'd need evidence as to whether the prediction came to pass once the date in town had shown up. Well, there was, and there is evidence as of and beyond the transition date that was extra record evidence that does show exactly what you're asking. Fine, but it didn't happen, so maybe we need to remand it and let him decide to do it one way or the other, but not to do it with no record. Well, his decision, which is entitled to an abuse of discretion standard, his decision was that there was enough evidence, medical evidence, at the time that he looked at the case, Judge Carter, that said to him that she was disabled in the future beyond the transition date, and that's how he wrote it. And I think that he's entitled to an abuse of discretion standard review. Okay, anything else? Oh, we've got the parents of the own occupation, right? Just a final comment. I don't think there's anything magical about the transition date. Yes, the definition of disability changes, but under Armani, she was disabled from any occupational activity because a person tolerates less than four hours. And she made that claim, and I must correct Mr. Hess, the record clearly shows that she made that claim of any occupational disability right from the beginning, from her complaints and arguments to the trial court, and the briefings and oral argument before the trial court, over and over again. We made the any occupational claim and presented it before others as the evidence that under Armani, she was disabled from any occupational activity. No. Can I ask a question? Sure. I asked you whether you interacted with the findings of FACT. There's a heading in your brief that says the district court rejected these proposed findings of FACT and accepted those of Ms. Rios to file proposed findings of FACT. Yes. Were those the ones that were accepted? Those were the ones that were adopted, yes. But you told me what you told me was not true. I said you'll try to keep drafting those proposed findings of FACT. Oh, well, I didn't understand the question. No, those proposed findings were drafted by claimants' counsel, and the court adopted them. And we have a longstanding rule that those are retired requests, potentially, so they're drafted by the court. Well, the court's decision to adopt the claimants' findings of FACT, the defense counsel also proffered its own version of FACT. I guess it was misdrawn because I don't think my question was at all unclear. I mean, you assured me that it was drafted by the court, and then your brief says otherwise. I misunderstood. I apologize for that. Both sides drafted findings of FACT, the conclusions of both. The judge decided that he would adopt the plaintiff's version and reject the woman's version. But to get back to the point about argument for any occupational benefits, that happened throughout the trial, throughout the trial, both at the beginning with the complaint and all the way through the oral argument and the briefing in the district court and the briefing to this court. That was right from the beginning. And, again, I think that Armani governs this case. Now, one last point, Your Honor, if I may. That is, the policy does not require that Ms. Rios operate to surgery or invasive procedures. Mr. Chairman, I have a question about that. Is there any possibility that she did? Well, you know, that's her decision. I'm saying it's her decision, but we don't know what the decision was, and neither did Judge Carter. She decided to pursue conservative treatment, which one of her orthopedists, Dr. Malkius, indicated that she should do. Now, Your Honor, there's a reason for that. This is a lady that had tri-level degenerative arthritis and dysphagenic disease, stenosis and radiculopathy. She had a bad back, and in order to go into surgery, that would require an extensive surgical procedure in the lumbar spine. It would require fusion of three levels, and it would require- And steroid shots? What about steroid shots? About what? Steroid shots. Steroid shots. Oh, sorry, I'm sorry. Steroid injections. Well, they come in with a pill. Wow. And that's her decision. And that's a decision that she made with her doctors. You know, that was discussed, but she decided not to have that done because it probably wouldn't have helped. This is a bad back, Your Honor, and that's what we're dealing with. We're not dealing with a little bulging disc or a little disc or a little back. This is a bad back that really started three years before she came to file her complaint. Since 2015, she's had a back back, and there was an MRI back in 2015 that showed eye level, level two, two levels of deterioration. Three years later, in 2018, that had increased to three levels because this was a progressive degenerative disorder. Progressive degenerative disorder. Your Honor, thank you very much. Thank you very much. So Rios v. White Insurance Company. It's been submitted. Thank you.
judges: BERZON, RAWLINSON, Kennelly